STATE of Missouri, Plaintiff–Respondent,

v.

Terrance D. MYERS, Defendant–Appellant.

No. SD 29099.

Missouri Court of Appeals, Southern District, Division Two.

June 29, 2009.

---

Matthew Ward, Columbia, for Appellant.

Chris Koster, Atty. Gen., Jamie Pamela Rasmussen, Asst. Atty. Gen., Jefferson City, for Respondent.

## JOHN E. PARRISH, Judge.

Terrance D. Myers (defendant) was convicted, following a jury trial, of murder in the first degree. § 565.020.1.[1] He was sentenced to life imprisonment without possibility of parole. § 565.020.2. This court affirms.

"For purposes of its review, this court accepts as true evidence favorable to the verdict together with all favorable inferences. Contrary evidence and inferences are disregarded." *State v. Skipper*, 101 S.W.3d 350, 352 (Mo.App.2003).

In 2006 defendant and Sheryl Russell were living together. They had been together for seven or eight years. Defendant's brother, Roy Myers, testified that defendant told him that during the evening of March 11 or the early morning of March 12, Russell had been using methamphetamine. She and defendant argued. Russell grabbed a crossbow and tried, unsuccessfully, to cock it. When she was unable to do so, she came toward defendant with a kitchen knife. Roy said defendant told him he struggled with Russell; that he "had her around the throat"; that "he strangled her."

Chief Deputy Chris Jennings of the Newton County Sheriff's Department told the trial court that Sheryl Russell's body was found March 14. Defendant was taken into custody that day and interviewed by Officer Jennings. Officer Jennings told the trial court and the jury that defendant said he killed Russell. Defendant told Officer Jennings that "rather than let her stab him he strangled her."

Officer Jennings was asked if defendant had demonstrated how he choked Russell. He answered, "Yes, he did." Officer Jennings continued, "Basically he had strangled her physically, and he said that she went to the ground gasping for air. He said at that point he got a dog leash and wrapped it around her throat to keep her from breathing any further, and went outside and smoked a cigarette."

Officer Jennings was asked the following questions and gave the following answers.

Q. ... Did he say why he tied a dog leash around her?

A. He made the comment that the bitch wasn't going to hurt him again.

Q. Is that the language he used?

A. That's the exact language.

Q. Did he say how long he had left the leash on her?

A. I believe it was several minutes. He went out and smoked a cigarette. So during that timeframe.

Q. What did he indicate he had done after he came back in? Well, first of all, did he indicate she was still alive when he came back in?

A. He said when he came back in she had quit breathing.

Q. What did he say he did at that point?

A. At that point he wrapped her in a sheet and took the—he said he took the dog leash, wrapped it around her body to make it I guess easier to carry, and took her out and placed her in the trunk of his car.

Defendant told Officer Jennings that after this occurred, he thought he needed to establish an alibi; that "he went to two different businesses, one adult shop and

---

1. References to statutes are to RSMo 2000.

bought some lotion, and then went to Wal-Mart and bought some time for his cell phone." Defendant also told about burying Russell. Defendant said he took his fishing pole and pretended to be fishing. He would fish awhile and then dig for awhile so that if someone came by they would see him fishing.

Defendant asserts two points on appeal. The first is directed to the admission in evidence of statements made to Officer Jennings. Defendant contends the trial court erred in denying his motion to suppress the statements and in admitting them in evidence; that they were obtained in violation of his *Miranda*[2] rights. The second claims the trial court erred in refusing to give certain jury instructions defendant tendered at trial.

 Point I claims the trial court erred in admitting statements in evidence that defendant made to Officer Jennings; that they were obtained after defendant invoked his right to counsel and his right to be free from self-incrimination. The issue defendant asserts in Point I was the subject of a motion to suppress evidence that was heard prior to trial. The statements were also objected to at trial as having been obtained in violation of defendant's *Miranda* rights.

> [W]hen deciding whether to allow the introduction of a defendant's inculpatory statements over *Miranda* objections, a trial court "may base its decision on evidence heard at the suppression hearing, evidence received at trial, or both." [*State v. Finster,*] 963 S.W.2d [414] at 417[3] [ (Mo.App.1998) ].

*State v. Finster,* 985 S.W.2d 881, 887 (Mo. App.1999).

The statement defendant made to Officer Jennings was videotaped and admitted in evidence at the suppression hearing. The videotape was filed with this court. The trial court took the motion to suppress defendant's statement under advisement. It subsequently denied the motion.

This court's review of a trial court's decision concerning a motion to suppress evidence "is limited to a determination of whether there is substantial evidence to support its decision." *State v. Tackett,* 12 S.W.3d 332, 336 (Mo.App.2000). The decision of the trial court will be reversed only if it is clearly erroneous and this court is "left with a definite and firm belief a mistake has been made." *State v. Leavitt,* 993 S.W.2d 557, 560 (Mo.App.1999). This court will view all evidence and any reasonable inferences therefrom in the light most favorable to the ruling of the trial court. *Tackett,* 12 S.W.3d at 336.

*State v. West,* 58 S.W.3d 563, 567 (Mo.App. 2001).

 After defendant began talking to Officer Jennings, he asked for an attorney. Questioning stopped at that point. However, defendant made additional statements. The issue presented is whether defendant reinitiated the interrogation process of his own volition and, if he did, whether the statements he then made were the basis of a knowing, intelligent, and voluntary waiver. *See Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The Fifth Amendment prohibition against compelled self-incrimination provides an accused with the right to have counsel present during custodial interrogations. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). If an accused requests an attorney, the interrogation process must cease until an attorney is provided or until the accused reinitiates the pro-

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

cess of his or her own accord. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981).

*State v. Hensley,* 83 S.W.3d 681, 690 (Mo. App.2002).

Defendant had been advised of his *Miranda* rights prior to his March 14 interrogation by Officer Jennings. Officer Jennings told defendant what he had experienced when Sheryl Russell's body had been found and exhumed. Officer Jennings told defendant that it was not pleasant; that the body was being autopsied. He asked defendant if he had thought about what he did or if he acted on the spur of the moment. He asked if Russell had attacked defendant or if defendant attacked her. Defendant responded by asking whether if he told the truth right then, he could walk away and be with his children. Officer Jennings replied that defendant was not walking out of there either way. Defendant then said he wanted a lawyer. Officer Jennings told defendant "[o]kay" and added it was the only chance he would have. Officer Jennings asked if defendant knew the difference between "first and second degree." Defendant told Officer Jennings that he did not. Officer Jennings explained that first degree meant that he had thought out what he did and premeditated on it. Defendant said he did not know what he did; that he would wait for a lawyer. Officer Jennings acknowledged that defendant had asked for an attorney and told defendant he was not going to ask any more questions. Defendant repeated that he wanted a lawyer.

Officer Jennings remarked that what he wanted to know was whether what occurred was self-defense. Defendant said he wanted to talk to him. Defendant was asked if he was changing his mind about talking to the officers. He said, "Yes." The other officer who was in the room, Officer Rick Geller, asked defendant if he was going to talk to them. The video shows defendant nodding his head. The interview continued.

The trial court made a lengthy recitation of its ruling regarding the motion to suppress that was directed to the videotaped statement. The judge told the attorneys:

> The Court ... reviewed the videotape, and from the review of that tape has found that Defendant certainly understood his rights that day. He took his time, methodically walked through the written waiver form, signed it, had some discussions with the detectives, and then asserted his right to counsel.... [D]etectives properly had him review his rights again, sign off on that document again prior to questioning. He had the ability to assert that right. In fact, at a later point did assert it. The Court reviewed the time that transpired from the time the Defendant—for the second time asserted his rights, right to counsel, requested counsel, approximately fifty-five seconds passed from that point until the time the Defendant reengaged in the conversation with the detectives. The Court, in reviewing the videotape, gave significant weight to the officers' conduct while in the presence of the Defendant after—immediately after he asserted his right to counsel, or requested counsel. I was unable to see one officer, as I recall, but the officer that I did view immediately got up and began to turn towards the door, the other detective, Detective Jennings, who had been questioning, made a comment to the Defendant. I don't have the specifics in front of me, but ... something to the effect of, "This will be the last time you get a chance to talk to us". From his own conduct it was clear he was also standing and going to be heading towards the door, the Defendant recognized that. It was very obvious to the

Court in reviewing the videotape that he recognized the officers were leaving and going to allow him to assert that right, and he recognized that he did not want them to leave that room. So the record is clear, he held up both hands as in a gesture to the officers, don't leave the room, I want you to come back and speak to me. It was clear to this Court that he reengaged under his own volition, reengaged the officers, and did not intend to pursue his right to counsel at that time, but instead knowingly waived that right, knowing of that right, asked the officers to return and speak to him. Very clear that he was not under duress that would cause him to not understand what was occurring. He was clearly cognizant of his decision, and for that reason I find that he voluntarily reengaged with the officers, and, therefore, waived his right to counsel.

In reviewing defendant's claim of error, this court is limited to determining whether the evidence, gleaned from the record as a whole, is sufficient to support the trial court's decision. *State v. Pfleiderer,* 8 S.W.3d 249, 253 (Mo.App.1999); *State v. McKeehan,* 894 S.W.2d 216, 218 (Mo.App. 1995). The evidence and reasonable inferences therefrom is viewed in the light most favorable to the trial court's decision. *Pfleiderer, supra.* "Consideration of the weight of the evidence presented at the hearing on the motion to suppress is within the discretion of the trial court." *Id.*

■ The trial court concluded that defendant knowingly waived his right to counsel; that he was not under duress when he did so; that he voluntarily reengaged the officers who had been questioning him, therefore, waiving his right to counsel. "The test for voluntariness is whether under the totality of the circumstances the defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time of the confession." *State v. Williams,* 956 S.W.2d 942, 948 (Mo.App. 1997). The trial court found defendant's acts were voluntary. This court holds that the evidence before the trial court was sufficient, gleaned from the record as a whole, to support that court's decision; that its decision was not clearly erroneous.[3] Point I is denied.

■ The trial court instructed the jury on murder in the first degree, and on lesser-included offenses of murder in the second degree and voluntary manslaughter. Point II argues that the trial court erred in failing to instruct on involuntary manslaughter in the first degree and involuntary manslaughter in the second degree as lesser included offenses. Defendant tendered instructions on those offenses to the trial court. They were refused. Defendant contends this was error.

Defendant refers to the testimony of three witnesses in arguing that the trial court erred in not instructing on involuntary manslaughter—forensic pathologist, Dr. Keith Norton, defendant's brother, Roy Myers, and Joseph David Bogle, the booking officer at the Newton County Jail at the time defendant was incarcerated there. Dr. Norton testified as to Sheryl Russell's cause of death. He stated that the cause of death was strangulation. He added, "Whether it was manual or ligature, I couldn't tell for sure. And by manual I mean by a hand, and ligature is

---

3. There was evidence of statements defendant made to others admitting his guilt, including statements made to his brother, Roy Myers. Arguably, even had it been error to admit Officer Jennings' testimony, it is questionable that defendant could show prejudice in that "[i]t is not error to admit normally inadmissible evidence over objection when the evidence is cumulative." *State v. Head,* 834 S.W.2d 898, 899 (Mo.App.1992).

with some narrow body." Roy Myers and Officer Bogle testified as to statements defendant made to them. Each testified that defendant said he choked Russell in order to keep her from hurting him.

■ Defendant argues that this evidence would support a claim that Russell died prior to defendant having put the dog leash around her neck; that she, therefore, died from manual strangulation. He says, based on that possibility, the jury could have found that he acted recklessly or with criminal negligence, not knowingly or deliberately; that this warranted instructing on involuntary manslaughter in both the first and second degree, as lesser-included instructions.

A lesser-included offense is an offense established by proof of the same or less than all the facts required to establish the commission of the charged offense. *State v. Derenzy,* 89 S.W.3d 472, 474 (Mo.banc 2002). An offense is a lesser-included offense if it is impossible to commit the charged offense without necessarily committing the lesser. *Id.* Or, as stated in *State v. Harris,* 598 S.W.2d 200, 202 (Mo.App.1980), "If the greater of two offenses includes all the legal and factual elements of the lesser, then the lesser is an included offense."

*State v. Whiteley,* 184 S.W.3d 620, 623 (Mo.App.2006).

■ Section 556.046.3 provides:

The court shall be obligated to instruct the jury with respect to a particular included offense only if there is a basis in the evidence for acquitting the defendant of the immediately higher included offense and there is a basis in the evidence for convicting the defendant of that particular included offense.

"Nevertheless, a defendant is not entitled to an instruction on a lesser-included offense unless the instruction is supported by the evidence and any logical inferences derived from that evidence." *State v.*

*Newberry,* 157 S.W.3d 387, 393 (Mo.App. 2005).

The evidence does not support defendant's argument that he acted recklessly or with criminal negligence when he grabbed defendant's neck so hard that she fell to the floor, and when he tightened the dog leash around her neck. Defendant did not call for medical help. Rather, after tightening the dog leash around her neck, he left her where she had fallen and went out to smoke a cigarette. Defendant's explanation to Officer Jennings "that the bitch wasn't going to hurt him again" dispels his claim of reckless or criminally negligent conduct and highlights that his acts were knowing and deliberate.

After defendant ascertained that Russell was dead, he wrapped her body in a sheet and put it in the trunk of his car. He went to two businesses in an attempt to establish an alibi. He lied to law enforcement officers when he first spoke to them, telling them that Russell left after he and she argued; that when he awakened the next morning, she was gone. His conduct demonstrated, as the jury found, that in the course of causing Sheryl Russell's death, defendant knew or was aware that his conduct was causing, or was practically certain to cause, her death; that this occurred after deliberation.

The evidence that was before the trial court and jury did not demonstrate a questionable element to the offense of murder in the first degree. The trial court did not err in refusing to instruct the jury on involuntary manslaughter as a lesser included offense. Point II is denied. The judgment is affirmed.

BURRELL, P.J., and RAHMEYER, J., concur.